Appellants Lindy Ball and Jason Witte appeal the judgment of the Summit County Court of Common Pleas, Juvenile Division, terminating their parental rights to their minor son, Craig Ball. This Court affirms the judgment of the trial court.
 I.
Craig Ball was born on March 3, 1996 to Lindy Ball and Jason Witte. Craig was born with a congenital birth defect that required surgery shortly after his birth. Craig has other developmental delay problems and requires therapy for his various physical and intellectual problems. During her pregnancy and after his birth, Ms. Ball and Mr. Witte resided with Ms. Ball's parents, but shortly after her parents' divorce, they were forced to seek other housing. Over the next several months, the couple moved numerous times staying with relatives and friends. In January 1997, Mr. Witte was incarcerated, and shortly thereafter, Ms. Ball was admitted to the Psychiatric Unit of Akron General Hospital for severe depression and suicidal ideation. On January 29, 1997 Summit County Children's Services Board ("C.S.B.") moved the trial court for emergency custody of Craig. Upon agreement of the parties, the trial court adjudicated Craig a dependent child and placed him in the temporary custody of C.S.B. on April 23, 1997.
Prior to moving for permanent custody of Craig, C.S.B. implemented and the trial court adopted a case plan with the goal of reuniting Craig with his biological parents. The objectives set forth by the case plan were as follows: (1) Ms. Ball had to continue to address her personal mental health issues through Portage Path Behavioral Health Center ("Portage Path") and follow its recommendations; (2) Ms. Ball and Mr. Witte were to establish and maintain "a stable, safe, and nurturing home environment[;]" (3) Ms. Ball and Mr. Witte were to improve their parenting skills through parenting classes; (4) Ms. Ball needed to "address her medical issues and continue with her medication[;]" and (5) establish a safe environment for Craig and properly address his medical needs. This case plan was later modified to include an objective requiring Mr. Witte to attend anger-management classes due to his physical abuse of Ms. Ball and Craig.
On October 7, 1997, the trial court conducted a review hearing pertaining to C.S.B.'s request for continued temporary custody of Craig. The trial court granted continued temporary custody and again amended the case plan to require Mr. Witte to attend anger management, and for Ms. Ball to continue to take her anti-depressant medication and attend counseling. After both parents' failure to comply with their case plans, and their failure to consistently attend the scheduled visitations with Craig, C.S.B. moved for permanent custody of Craig on December 1, 1997. The matter proceeded to trial.
Dr. Heather Queen-Williams testified pertaining to her treatment of Ms. Ball. Dr. Queen-Williams is a psychiatrist employed by Portage Path. She treated Ms. Ball and diagnosed her as having major depression and borderline intellectual functioning. Dr. Queen-Williams testified that Ms. Ball was referred to Portage Path's emergency services on January 28, 1997, for depression and for expressing suicidal ideation by cutting herself. An initial assessment was completed for Ms. Ball on January 31, 1997, and it was recommended that she participate in the intensive treatment services ("ITS"). Stress factors identified by Dr. Queen-Williams that contributed to Ms. Ball's condition included abuse by her boyfriend and his later arrest, her parents' divorce, financial difficulties, and a feeling of being overwhelmed with the parenting of her son Craig.
On February 10, 1997, a comprehensive treatment plan was completed for Ms. Ball. This entailed several goals including the reduction of depressive symptoms, adoption of positive coping skills, increasing her level of functioning, improving her parenting skills, and obtaining independent living. Individual therapy, ITS, psychiatric follow-ups, and medications were to be implemented in order to achieve these goals. Ms. Ball completed her clinical evaluation but failed to appear for either her ITS evaluation or her initial therapy appointment. She eventually completed the ITS evaluation, but then missed several appointments with Dr. Queen-Williams before completing her psychiatric evaluation. Dr. Queen-Williams testified that in addition to cutting herself, Ms. Ball had previously attempted suicide in 1996 by hanging herself. Nonetheless, Ms. Ball's case was closed by ITS in April 1997 because she routinely failed to attend her therapy sessions.
In May 1997, Ms. Ball was admitted to the crisis stabilization unit of Portage Path for depression and her apparent intent to commit suicide after being found scratching her wrists with a knife. She remained in the crisis stabilization unit for approximately eight days, and was being treated for severe depression and possible auditory and visual hallucinations. Upon being discharged, she was referred to Portage Path for follow-up counseling. Dr. Queen-Williams again treated Ms. Ball and indicated that she further diagnosed Ms. Ball with a personality disorder with borderline characteristics, some of which were dependent characteristics. It was recommended that Ms. Ball continue to take her medication, attend psychotherapy and psychiatric therapy, continue to attend ITS, and utilize the case management services to assist her in securing housing. However, Ms. Ball's case was again closed in August 1997 for her failure to follow through with the recommended course of treatment. Dr. Queen-Williams noted that Ms. Ball made only minimal progress and had not accomplished the goals set forth in her treatment program.
On October 10, 1997, Ms. Ball returned to Portage Path due to depression and continued suicidal ideation. Ms. Ball reported cutting herself on the arm and that she had tightened a belt around her neck until she passed out. Based upon this information, she was hospitalized. She expressed concern about increased financial difficulties, and physical abuse by her boyfriend. A comprehensive treatment plan was once more implemented, and she was referred to parenting classes in order to improve her parenting skills. Ms. Ball sporadically attended her therapy sessions and once more left treatment without successfully completing her treatment goals.
William Cardina is a social worker employed by C.S.B. in the protective services division. Mr. Cardina testified that he became involved in the case pertaining to Ms. Ball, Mr. Witte, and their infant son Craig during 1996, after a neglect referral was brought to C.S.B.'s attention that Craig had been left in the home alone for approximately twenty-five minutes. This referral was substantiated but Craig was not removed from the home at that time. Between this time and the fall of 1996, C.S.B. received additional referrals regarding alleged neglect of Craig. On November 8, 1996, C.S.B. received a referral from the Barberton Police Department that it had removed Craig from Ms. Ball's and Mr. Witte's care based upon the living conditions under which Craig was being kept. This case was eventually dismissed and C.S.B. continued to monitor the situation through home visits.
Mr. Cardina provided additional testimony pertaining to Mr. Witte's criminal record. He indicated that Mr. Witte had three convictions for domestic violence, two for physical abuse of Ms. Ball, and one for striking Craig with a diaper bag. Mr. Witte has also been convicted for aggravated menacing and three separate charges of theft. Mr. Cardina also testified that Mr. Witte attempted suicide while incarcerated and was then evaluated by Portage Path. Mr. Cardina indicated that he attempted to facilitate compliance with the case plan objectives by encouraging the parents to follow through with the recommendations made in the case plan, by making referrals, and by providing bus passes for transportation. He concluded his testimony at trial by opining that it was in Craig's best interest to be placed in the permanent custody of C.S.B.
Dr. Ralph Huhn is a psychologist and certified chemical dependency counselor employed by Portage Path. Dr. Huhn testified that Mr. Witte was referred to the crisis center in February 1997 for suicidal ideation after he cut his wrists. After his discharge from the crisis center, Mr. Witte was scheduled to return to Portage Path for a follow up appointment. He failed to appear for this appointment. Mr. Witte failed to attend numerous other appointments scheduled with Dr. Huhn, and appointments for evaluations. Eventually Mr. Witte was evaluated and Dr. Huhn testified that he diagnosed Mr. Witte as having adjustment disorder with depressed mood, and wanted to further evaluate him to rule out caffeine dependency and personality disorder. Dr. Huhn recommended that Mr. Witte attend counseling and that he see a psychiatrist for further evaluation. Dr. Huhn also referred Mr. Witte to a parenting group, and he later referred Mr. Witte to the center's "drop-in" group due to his inconsistent attendance at his scheduled therapy with Dr. Huhn. Mr. Witte's case was transferred to another office per his request. However, he never made any appointments or attended therapy after his case was transferred. Dr. Huhn had no further contact with Mr. Witte.
Ms. Catherine Kapalko is employed as an outreach worker at the Decker Family Development Center. Ms. Kapalko testified that she works specifically with children who have special needs and their parents. She indicated that she worked with Ms. Ball and Craig beginning in the fall of 1996. Ms. Kapalko stated that Ms. Ball brought Craig to class on several occasions with dirty bottles filled with spoiled formula, inappropriately dressed for the weather conditions, and physically dirty. Ms. Ball maintained a very poor attendance record at the Decker Center, and failed to successfully complete the programs in which she was enrolled.
Ms. Rose Verleny was the guardian ad litem appointed on Craig's behalf. Ms. Verleny testified that upon being appointed in December 1997, she first met with Craig. He was approximately one year and nine months old at the time and she found him to be thin, not walking well, and not talking or making any sounds. Ms. Verleny attended the scheduled visitations and noted that, when they attended, the parents interacted with Craig appropriately, but that they often missed the visits. However, Ms. Verleny noted that both parents appeared to lack appropriate parenting skills and that Ms. Ball appeared "overwhelmed" at times. Ms. Verleny recommended that Craig be placed in the permanent custody of C.S.B. due to his special needs and Ms. Ball's and Mr. Witte's failure to improve their condition and their inability to adequately care for the child. She further opined that it was in Craig's best interest to be placed in the permanent custody of C.S.B. in order to be placed in a safe and stable environment.
Ms. Verleny also testified that she investigated the possibility of placing Craig in the custody of Ms. Ball's mother. Ms. Verleny indicated that although the home was physically appropriate, she would not recommend placing Craig with his grandmother. The bases for this recommendation were the return to the home of Craig's uncle who had been detained for raping his eleven year old niece, as well as the presence of the grandmother's live-in boyfriend who was a convicted felon for crimes of violence.
At the conclusion of all the testimony, the trial court took the matter under advisement. On May 28, 1998, the trial court granted C.S.B.'s motion for permanent custody. Ms. Ball and Mr. Witte appealed and the cases were consolidated. As they relate, their assignments of error will be addressed together. The additional issues presented for review will be addressed in turn.
 II.
Ms. Ball's Second Assignment of Error
 The trial court's factual findings supporting it's [sic] decision that the minor child could not be placed with [Ms. Ball] within a reasonable time or should not be placed with [Ms. Ball] were against the manifest weight of the evidence.
Mr. Witte's First Assignment of Error
 The decision of the trial court in placing the child of [Mr. Witte] in the permanent custody of the Summit County Children Services Board is against the manifest weight of the evidence.
Ms. Ball and Mr. Witte first contend that the trial court's judgment was against the manifest weight of the evidence. This assertion is without merit.
This Court has held that the same standard used in evaluating whether a criminal conviction is supported by the manifest weight of the evidence is to be used where a civil judgment is challenged on such basis. Frederick v. Born (Aug. 21, 1996), Lorain App. No. 95CA006286, unreported at 14. Therefore, an appellate court must
 "review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered."
State v. Gilliam (Aug. 12, 1998), Lorain App. No. 97CA006757, unreported at 3, quoting State v. Otten (1986), 33 Ohio App.3d 339,340. The Ohio Supreme Court has held that "[w]hen a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." State v. Thompkins
(1997), 78 Ohio St.3d 380, 387, quoting Tibbs v. Florida (1982),457 U.S. 31, 42, 72 L.Ed.2d 652, 661. In addition, this Court cautioned in In re Fast (Mar. 25, 1992), Summit App. No. 15282, unreported at 5, that due to the seriousness of the decision to terminate parental rights of a natural parent, a reviewing court must not substitute its judgment for that of the juvenile court. Thus, "[a] reviewing court will not disturb the judgment of a juvenile court which is supported by some competent credible evidence going to all the essential elements of the case." In reEverhart (Dec. 11, 1996), Summit App. No. 17786, unreported at 6, citing In re Parsons (May 29, 1996), Lorain App. No. 95CA006217, unreported at 3.
R.C. 2151.41.4 governs the procedure implemented when a public agency moves for permanent custody of a minor child. Specifically, R.C. 2151.41.4(B) states in relevant part:
 The court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
 (1) The child is not abandoned or orphaned and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents[.]
In determining the best interest of the child, R.C. 2151.41.4(D) requires the trial court to consider all relevant factors, including, but not limited to, the following:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
(3) The custodial history of the child;
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.
When considering whether a child cannot, or should not, be placed with either parent within a reasonable period of time, R.C. 2151.41.4(E) requires the trial court to consider all relevant evidence. If the court finds by clear and convincing evidence, that one or more of the following exist, the court shall enter a finding that the child cannot, or should not, be placed with either parent within a reasonable time:
 (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties;
 (2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purpose of division (A)(4) of section 2151.35.3 of the Revised Code;
 (3) The parent committed any abuse as described in section 2151.03.1 of the Revised Code against the child, caused the child to suffer any neglect as described in section 2151.03 of the Revised Code, or allowed the child to suffer any neglect as described in section 2151.03 of the Revised Code between the date that the original complaint alleging abuse or neglect was filed and the date of the filing of the motion for permanent custody;
 (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
 (5) The parent is incarcerated for an offense committed against the child or a sibling of the child;
* * *
 (7) The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing;
 (8) The parent is repeatedly incarcerated and the repeated incarceration prevents the parent from providing care for the child;
 (9) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect;
 (10) The parent has committed abuse as described in section 2151.03.1 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety;
 (11) The parent committed abuse as described in section 2151.03.1 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code and a sibling of the child previously has been permanently removed from the home of the child's parents because the parent abused or neglected the sibling.
(12) Any other factor the court considers relevant.
After reviewing the record in the instant case, this Court cannot conclude that the trial court's judgment was against the weight of the evidence. The trial court properly considered the statutory requirements and the record reveals that both parents failed to comply with the parameters of their case plan. In addition, both parents exhibited a history of psychological problems and failed to attend counseling to remedy their conditions. Mr. Witte has a history of violence toward Ms. Ball and Craig and has failed to obtain the necessary treatment to control his anger. He has been convicted for domestic violence for incidents involving both Ms. Ball and Craig. Based upon their history of chronic mental instability, their failure to comply with the case plan, and to provide a stable home environment for Craig's needs, the trial court's judgment was not against the weight of the evidence. Accordingly, Ms. Ball's second assignment of error and Mr. Witte's first assignment of error are overruled.
Ms. Ball's First Assignment of Error
 The trial court erred as a matter of law in finding that the minor child could not be placed with [Ms. Ball] within a reasonable time or should not be placed with [Ms. Ball] contrary to Ohio Revised Code § 2151.41.4(E).
Ms. Ball's Fourth Assignment of Error
 The trial court's finding that CSB had exhausted all reasonable efforts to reunify this child with his parents was contrary to law, against the manifest weight of the evidence and an abuse of discretion.
Mr. Witte's Second Assignment of Error
 The trial court erred in divesting [Mr. Witte] of his parental rights in that there was not reasonable case planning nor diligent efforts made by the Summit County Children Services Board to assist in remedying the problems facing [Mr. Witte], and the child could have been reunified within a reasonable amount of time.
In these assignments of error, Ms. Ball and Mr. Witte present two distinct issues for review. First, they assert that the trial court erred in determining that Craig could not be reunited with his parents within a reasonable time. Second, they claim that C.S.B. failed to implement proper case planning. These assertions are without merit.
In the first instance, Ms. Ball and Mr. Witte maintain that the trial court erred by determining that Craig could not be placed with them within a reasonable period of time. Regarding Ms. Ball's assignment of error, she fails to argue separately the trial court's finding that Craig could not and should not be placed with her within a reasonable time. Rather, she argues simply that the trial court's finding was against the weight of the evidence. Based upon our disposition of her second assignment of error, this assignment of error is also overruled. Similarly, Mr. Witte failed to separately argue this issue in his brief before this Court. Therefore, this portion of Mr. Witte's assignment of error is also overruled.
We turn next to the issue of whether C.S.B. properly administered this case through reasonable case planning. This contention simply ignores both parents' utter failure to follow through with the recommendations of their case worker and treating physicians, made for their mental health treatment, and for not following the parameters of their case plans. The record is replete with instances of both C.S.B. and other community organizations' efforts to provide both Ms. Ball and Mr. Witte with counseling and medication for their mental instabilities. Mr. Cardina testified extensively regarding his involvement with both appellants and his efforts to assist them in complying with their case plan, including providing transportation to counseling. Both appellants seek to impose a greater burden upon C.S.B. than that dictated by the statute. R.C. 2151.41.4(E) requires C.S.B. to implement reasonable case planning. The record supports the trial court's finding that C.S.B. implemented and administered a reasonable case plan for both Ms. Ball and Mr. Witte, and that C.S.B. made diligent efforts to assist both parents to achieve the goals of their case plan. Accordingly, Ms. Ball's fourth assignment of error, and this portion of Mr. Witte's second assignment of error are overruled.
Ms. Ball's Third Assignment of Error
 The trial court erred as a matter of law in finding that it was in the minor child's best interest to grant permanent custody to CSB [sic] contrary to Ohio Revised Code § 2151.41.4(D).
In her third assignment of error, Ms. Ball avers that the trial court erred by finding it in Craig's best interest to be placed in the permanent custody of C.S.B. This assertion lacks merit.
Ms. Ball argues that the factors enumerated in R.C. 2151.41.4(D) for determining the best interest of the child favor a finding that it is in Craig's best interest to be reunified with his mother. However, this contention overlooks the facts presented before the trial court. In relation to the first enumerated factor, whether a bond exist between the parents and foster parents, testimony elicited at trial demonstrated that Craig had a strong bond with his foster parents. It was further indicated that while Craig recognized his parents, he displayed reaction neither upon seeing them for visitation nor upon leaving them at the conclusion of the visitation. The second factor set forth by R.C. 2151.41.4(D) requires the trial court to consider the child's wishes as expressed by the child or his guardian ad litem. In the instant case, Craig's guardian ad litem testified that it was in Craig's best interest to be placed in the permanent custody of C.S.B. Ms. Verleny indicated that Ms. Ball lacked the necessary parenting skills and the ability to properly provide for Craig. Finally, the record evidences that Craig has been in the temporary custody of C.S.B. since January 29, 1997, and based upon his developmental delays, he is in need of a legally secure placement that cannot be achieved by reuniting him with Ms. Ball. Therefore, her third assignment of error is overruled.
Ms. Ball's Fifth Assignment of Error
 The trial court's denial of the maternal grandmother's motion for legal custody was contrary to law, against the manifest weight of the evidence and/or an abuse of discretion.
Finally, Ms. Ball claims that the trial court should have placed Craig in the permanent custody of his maternal grandmother. This contention is meritless.
A fundamental principle of appellate procedure requires the party presenting the claim to have standing to properly raise the issue before this Court. In this assignment of error, Ms. Ball attempts to present an issue that could only properly be presented by the maternal grandmother. As this Court has previously held inIn re Rackley (Apr. 8, 1998), Summit App. No. 18614, unreported at 5, "an appellant may not challenge an alleged error committed against a non-appealing party absent a showing that she herself has been prejudiced by the alleged error." Ms. Ball has failed to demonstrate how she was prejudiced by the trial court's refusal to place Craig in the custody of his maternal grandmother. As such, she lacks standing to raise the issue before this Court. Her fifth assignment of error is overruled.
Mr. Witte's Third Assignment of Error
 The Appellate Court must reverse and remand the Trial Court's order granting permanent custody of the child to Summit County Children Services Board on the basis that [Mr. Witte] was denied effective assistance of counsel.
In his final assignment of error, Mr. Witte avers that he was denied the effective assistance of trial counsel. This Court disagrees.
As set forth in In re Rackley (July 16, 1997), Summit App. No. 18139, unreported at 5, this Court will apply the same standard in permanent custody cases for reviewing effective assistance of counsel claims as that applied in criminal cases. Thus, a successful ineffective assistance of counsel claim requires a showing that counsel's performance has "fallen below an objective standard of reasonable representation" and that prejudice arose from counsel's performance. State v. Bradley
(1989), 42 Ohio St.3d 136, paragraph two of the syllabus. "To show that [an individual] has been prejudiced by counsel's deficient performance, [he] must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." Id. at paragraph three of the syllabus.
In the instant case, Mr. Witte contends that his trial counsel was deficient because she failed to effectively cross-examine witnesses, object to questions posed by the state regarding his prior convictions, and failed to have him take the stand at trial. However, it is well settled that debatable trial tactics do not give rise to a claim for ineffective assistance of counsel. State v. Clayton (1980), 62 Ohio St.2d 45, 49. An assertion of such a claim must be raised with sufficient clarity to indicate a substantial violation of an essential duty. Statev. Watson (July 30, 1997), Summit App. No. 18215, unreported at 6, citing State v. Nabozny (1978), 54 Ohio St.2d 195, paragraph four of the syllabus. This Court has held that "[a] strong presumption exists that licensed attorneys are competent and that the challenged action is the product of a sound strategy." Watson,supra, at 4. See State v. Hamblin (1988), 37 Ohio St.3d 153,155-56. As such, the tactics used by trial counsel do not give rise to a claim for ineffective representation. It is equally well settled that "trial counsel's failure to make objections are 'within the realm of trial tactics' and do not establish ineffective assistance of counsel." State v. McCroskey (Apr. 2, 1997), Wayne App. No. 96CA0026, unreported at 10, quoting State v.Hunt (1984), 20 Ohio App.3d 310, 311. Accordingly, Mr. Witte's contention that his counsel's cross-examination tactics, and alleged failure to object amount to ineffective assistance of counsel is without merit.
Finally, Mr. Witte asserts that his failure to take the stand at trial was the result of ineffective assistance of counsel. As an initial matter, whether a party takes the stand in his own defense falls within the realm of trial tactics, which, as discussed above, do not give rise to a claim of ineffective assistance of counsel. Nonetheless, Mr. Witte fails to demonstrate how the result of the trial would have been different if he had testified. He maintains that he could have provided information he acquired "from parenting education, from counseling sessions, with respect to his criminal convictions, and the stability of his current living arrangement[.]" Although the trial court stated in its findings that Mr. Witte did not challenge his convictions, even if he had testified, the fact that he had prior convictions for domestic violence relating to both Ms. Ball and Craig, for aggravated menacing, and for theft offenses cannot be challenged. In addition, the testimony was clear that he failed to attend his counseling sessions, was discharged from his treatment program due to non-attendance, and began attending parenting classes only after C.S.B. moved for permanent custody of Craig. As such, Mr. Witte has failed to establish that his taking the stand would have led the trial court to a different conclusion. Mr. Witte has failed to either establish that his trial counsel's performance was deficient or that the trial court would have reached a different conclusion but for those alleged deficiencies. His third assignment of error is, therefore, overruled.
 III.
Ms. Ball's and Mr. Witte's assignments of error are overruled. The judgment of the trial court is affirmed.
Judgment affirmed.
 KK The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the County of Summit, Court of Common Pleas, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
BAIRD, P.J. and SLABY, J. CONCUR.
(Reece, J., retired Judge of the Ninth District Court of Appeals, sitting by assignment pursuant to Section 6(C), Article IV, Constitution.)